# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

LOCKETT CONSTRUCTION, INC., a Washington corporation,

Plaintiff,

v.

REDMAN HOMES, INC., d/b/a CHAMPION HOMES OF OREGON, a registered foreign corporation,

Defendant.

CASE NO. C08-5098BHS

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on the motion for summary judgment filed by Defendant Redman Homes, Inc., d/b/a Champion Homes of Oregon ("Champion"). Dkt. 22.

## I. BACKGROUND

This matter involves a dispute between subcontractor Lockett Construction, Inc. ("Lockett") and contractor Champion. Unless otherwise indicated, the following facts are undisputed or taken in the light most favorable to Plaintiff, the nonmoving party.

**A. FORT LEWIS HOUSING PROJECT**

Prior to the formation of the relationship between Lockett and Champion, Fort Lewis Communities, LLC, was formed to manage housing at Fort Lewis, Washington. Dkt. 22 at 4 (Defendant's motion for summary judgment). Fort Lewis Communities retained Equity Residential and Lincoln Properties, LP, in partnership, to construct homes at Fort Lewis. *Id*. Equity was on-site as the owner and Lincoln was on-site as the general contractor. *Id*. On January 20, 2005, Lincoln Properties entered into a contract with Champion ("Lincoln-Champion contract") for Champion to act as the general contractor

ORDER – 1

for the construction of housing at Fort Lewis. *Id.*; Dkt. 23-2 and 23-3 (Exhibit 1) (Lincoln-Champion contract).

Under this contract, Lincoln and Champion agreed that the majority, if not all, of the construction project would be designed and constructed in sub-phases. Dkt. 23-2, 2-3 (Sec. 1.3.1). The parties agreed that performance would be governed by the terms of the Lincoln-Champion contract, as well as "other contract documents to be hereafter established by the parties in a corresponding amendment" to the Lincoln-Champion contract. *Id.* In addition, each sub-phase was to be separately administered, with a separate fixed price, time of performance, performance schedule and cost breakdown (which the parties referred to as a "schedule of values"), and with separate obligations for invoicing, accounting, change orders, and payment. *Id.* Champion began work soon after the contract was executed.

According to Champion, by June 22, 2005, Lincoln had awarded Champion 40 buildings in eight contract amendments. Dkt. 22 at 4. Each amendment contained a length of time for Champion to complete its work – 12 weeks for earlier amendments, and 16 weeks for later amendments. *Id.* Champion further maintains that it was awarded an additional 27 buildings between August 2005 and January 2006. Dkt. 28 at 6.

**B.     NEGOTIATIONS BETWEEN CHAMPION AND LOCKETT**

At some point after Champion began work, it became apparent that Champion was not meeting the target dates set out in the amendments. Lockett maintains that Champion attributed its failure to meet target dates to a framing contractor, W&N. Dkt. 25 at 6 (Plaintiff's opposition to Defendant's motion for summary judgment). Champion then approached Lockett "asking whether Lockett could mobilize immediately and maintain an aggressive construction schedule." *Id.* While not entirely clear from the record, it appears that negotiations between Champion and Lockett began in early June 2005.

Steve Leedom of Champion negotiated with Scott Hanson, president of Lockett. During the June 2005 negotiations, Lockett believed that Champion intended for Lockett to work on buildings numbered through 67. Champion counters that Lincoln had only awarded Champion 40 buildings at the time of the June 2005 negotiations. Dkt. 22 at 4.

ORDER – 2

Specifically, Mr. Hanson maintains that throughout the negotiation process, Mr. Leedom represented to Mr. Hanson that "Lockett was required to pick up where W&N left off and complete Phase 1 work through Building 67." Dkt. 26 at 2 (Declaration of Scott Hanson). Mr. Leedom also allegedly told Mr. Hanson that "to satisfy the schedule, Lockett would have to complete its work before Thanksgiving of 2005." *Id*. Based on these representations, Lockett made an oral agreement with Champion; Mr. Hanson stated that "after analyzing the cost and time structure for the project, Lockett agreed to complete the work through Building 67 by November 16, 2005 at the agreed upon price." *Id*.

At the time the parties reached an oral agreement, or shortly thereafter, Champion issued Lockett a "recovery schedule." *Id*. at 3; Dkt. 26-2 (Exhibit 1).[1] The recovery schedule is a spreadsheet entitled "Champion/Fort Lewis On-Site Schedule" and is dated June 15, 2005. Dkt. 26-2 at 2. The first column on the left side of this schedule is titled "Bldg #" and the corresponding rows are numbered 1 to 67. *Id*. Across the top of the schedule are 18 additional column headings which include the names of subcontractors and corresponding work projects. *Id*. Five of these column headings are dedicated to Lockett, and the last Lockett column on the right is titled "Lockett: Siding." *Id*. Scrolling down to the Building No. 67 row of the schedule, the date listed under the column "Locket: Siding" is November 16. *Id*. at 3.

Based on the recovery schedule, Lockett produced a "schedule of values." Dkt. 26 at 2; Dkt. 26-3 (Exhibit 2). Lockett maintains that this document allocates "Lockett's costs across performance of work for the entirety of Phase 1 through Building 67." Dkt. 26 at 2. The schedule of values is a spreadsheet entitled "Billing Schedule of Values" and is dated June 20, 2005. Dkt. 26-3 at 2. This schedule lists 67 buildings, numbered 9

---

[1] According to James Cicchini, the authorized representative of Equity Residential/ Lincoln Properties, this recovery schedule was "effective when Champion brought Lockett . . . onto the project." Dkt. 35 at 2 (Declaration of James Cicchini). Mr. Cicchini maintains that "as the project progressed and Champion failed to maintain this schedule, updates and revisions were produced." *Id*.

ORDER – 3

through 67.[2] *Id*. For each building, the spreadsheet lists a dollar amount for the respective costs of the work projects, such as framing labor and framing materials. *Id*.

Mr. Hanson maintains that the parties' oral agreement was "expressly conditioned" on the recovery schedule and schedule of values. Dkt. 26-2 at 3. He further maintains that Lockett's contract price was based on completing Phase 1 work through Building 67 by November 16, 2005. Champion counters that although it hoped to have buildings completed by December 2005[3], it never made any promises to Lockett that its work would be completed by a date certain. Dkt. 22 at 7. Champion maintains that several schedules were generated throughout the project, but none were identified as a contractual promise. *Id*.

According to Mr. Hanson, after the oral agreement was reached, Champion directed Lockett to begin work immediately, and that written contract documents were not exchanged until after Lockett had already begun work.[4] Dkt. 26 at 3. Mr. Hanson maintains that written contract documents were not exchanged when Champion and Lockett reached the oral agreement because the parties had agreed upon price, duration, and scope. *Id*. Mr. Hanson states, "knowing that certain administrative terms had not yet been defined, Lockett had reached an acceptable agreement and commenced work on the project." *Id*.

At some point prior to June 22, 2005, Champion informed Lockett that in order for Champion's home office in Michigan to facilitate payment for Lockett's invoices, it was "procedurally necessary" for Lockett to sign some form of written agreement. *Id*. at 4. Champion then provided Lockett with a contract form. Lockett maintains that it made some "quick revisions, added a couple documents, and signed [the] drafted contract

---

[2] Apparently, Buildings 1 through 8 were completed at this time.

[3] According to the schedule cited by Lockett, Dkt. 26-2, the completion date for Lockett's work appears to be November 16, while completion for all work on the buildings was to be in December 2005.

[4] It is not clear when Lockett began work. According to Plaintiff's expert report, work began June 6, 2005. *See* Dkt. 27-2 at 6. However, the Court has stricken this report. *See supra* at 13.

ORDER – 4

form." *Id*. Lockett further maintains that "the existence of a written form [contract] also created the potential to define additional administrative terms that [the parties] had not previously addressed." *Id*.

According to Lockett, Champion did not return a copy of the contract to Lockett. *Id*. As a result, Lockett contends that it did not know whether Champion had signed the contract. Mr. Hanson stated that he asked Champion whether it had signed the contract, and Champion told him that if Lockett had made revisions to the contract, the Champion "home office" in Michigan would have to approve the revisions. *Id*. Mr. Leedom testified that Champion's home office would have been responsible for approving or disapproving Lockett's contract revisions and additions, but that he did not know whether, or when, Champion had returned the contract to Lockett. Dkt. 27-6 at 3 and 5 (deposition testimony of Steven Leedom).

Mr. Hanson maintains that this approval process "never happened." *Id*. Lockett nevertheless continued to work on the project because, according to Lockett, "time was of the essence," and Lockett was committed to staying on schedule to preserve its own time and cost structure and to avoid liability for delays to Champion. Dkt. 25 at 9.

## C. CHAMPION-LOCKETT WRITTEN CONTRACT

Lockett maintains that the contract document disappeared "into a state of limbo" until sometime in 2006. *Id*. at 12. It is not clear from the record when Lockett obtained a copy of the signed subcontract. Mr. Hanson states that the "written contract documents [were] circulated after project performance began." Dkt. 26 at 7.

### 1. The Subcontract filed with the Court

Champion filed a copy of the Champion-Lockett subcontract in support of its motion for summary judgment. Dkt. 23-4 (Exhibit 2). The contract documents filed by Champion are comprised as follows:

    **a.** **The subcontract**. The first document is ten-pages and is titled "Subcontract." At the top of the first page, Champion is listed as the contractor and Lockett is listed as the subcontractor. Under Lockett's contact information it reads: "Project: Fort Lewis, Washington, Subphases 1-8, Buildings \_\_\_ - 40." Beneath the

project information is the first main heading entitled "Terms and Conditions," next to which is a handwritten note written by Lockett: "(Including Addendum A)." On the last page of the subcontract are the parties' signatures, signed below the statement: "The parties have signed this Subcontract on the 22 day of June, 2005 as effective on the date ~~first set forth above~~ Lockett started."[5]

      **b.**    **Memorandum**. On the page following the subcontract is a memorandum from Champion to Lockett dated June 13, 2005. This document outlines Lockett's scope of work.

      **c.**    **Price Table**. On the next page is a table containing prices for materials, labor, siding, roof sheathing, and roof framing. This document is dated June 13, 2005.

      **d.**    **Blank Exhibits**. The next two pages are blank.

      **e.**    **Exhibit: Insurance Requirements**. The next page appears to be entitled "Exhibit B." This exhibit addresses insurance requirements for Lockett.

    f. *Addendum A*. This page was attached to the subcontract by Lockett and is not dated. Attached to this addendum is a schedule of values[6] dated June 20, 2005. This schedule lists buildings numbered 9 through 67.

    **2.**    **Pertinent Contract Provisions**

Similar to the Lincoln-Champion contract, the Champion-Lockett subcontract specified that the buildings would be awarded, at Champion's discretion, by Amendment:

> Each Sub-Phase shall be separately administered, with a separate fixed price (or, Contract Sum), time of performance (or, Contract Time), performance schedule, and cost breakdown (or, Schedule of Values) and with separate obligations for invoicing, accounting, change orders and payment. All Contractor's obligations as set forth in the Contract Documents are understood to be obligations that are to be separately performed for each Sub-Phase designated by Amendment whether or not such obligation is so qualified in the Contract Documents. . . . Nothing in this Agreement shall be interpreted as creating any obligation on the part of Contractor to deal exclusively with Subcontractor or to enter into any

---

[5] Lockett wrote above the strike-through: "Lockett started."

[6] The schedule of values attached to Addendum A appears to be the same document Lockett claims Champion provided during the parties' negotiations. However, Champion maintains that the two schedules differ. Dkt. 28 at 2, n. 6.

ORDER – 6

agreements with Subcontractor with respect to any Sub-Phase, for which an Amendment is not hereafter executed by Contractor and Subcontractor.

Dkt. 23-4 at 2 (Exhibit 2).

In addition, the subcontract includes provisions concerning notice requirements, delay, time of performance, and others.

    **a.** **Notice of Errors and Claims for Adjustment**. The subcontract required Lockett to acknowledge that it had carefully examined and understood the contract, *id.* (Sec. 1(d)), and that nothing had "come to [Lockett's] attention" that gave it reason to believe that the contract documents contained errors, *id*. (Sec. 1(f)). The subcontract also required Lockett to notify Champion in writing within three days of discovery of any errors or omissions in the contract documents. *Id*. (Sec. 1(g)).

The subcontract also included the following provision concerning delays:

> Subcontractor shall submit written notice thereof to Contractor if, in the opinion of the Subcontractor . . . the Owner or Contractor furnishes additional written or verbal instructions, information or directions that Subcontractor considers constitutes extra work or delay for which it is entitled to an adjustment of the Contract Sum or Contract Time. Such notice shall be provided prior to performance of the work affected by such instruction, information or direction and within five (5) Days after Subcontractor receives such instruction, information or direction. Failure to provide such written notice in the manner required by this Paragraph . . . shall constitute a waiver by Subcontractor of the right to any adjustment to the Contract Sum or Contract Time by reason of such instruction, information or direction.

*Id*. (Sec. 1(h)).

Similarly, the subcontract required Lockett to notify Champion in writing of any claim for adjustment within five days of the occurrence of the circumstances giving rise to such a claim. *Id*. (Sec. 8(b)).

The subcontract also required Lockett to notify Champion of any "ambiguity, misunderstanding or misconception" contained in the subcontract. *Id*. (Sec. 1(l)).

    **b.** **Time of Performance**. Section 3 of the subcontract is entitled "Time of Performance." This section provided the following provisions:

> a. Time is of the essence of this Subcontract. Subcontractor shall commence work immediately upon execution of this Subcontract. Subcontractor shall complete all of its work and its obligations under this

ORDER – 7

Agreement according to the schedule attached hereto as <u>Exhibit C</u>.[7] For purposes of this section, "completion of its work" means acceptance of its work by Contractor and the Owner or its representative.
    b. The time of completion shall be changed only by Change Order signed by Contractor and Subcontractor. . . .
    c. Subcontractor shall prepare a project schedule for its work on each Sub-phase in a form acceptable to Contractor. . . . The schedule, as approved by Contractor, shall become part of this Subcontract and Subcontractor shall be obligated to achieve the milestone dates contained in the schedule.

***

    f. Contractor shall not be liable to Subcontractor for any damages or costs due to delays, accelerations, non-performance, interferences with performance . . . unless damages directly result from fraudulent representation or intentional tortious conduct of Contractor.

**c. Miscellaneous Clauses**. Finally, Section 18(b) reads: "This Subcontract embodies the entire agreement between Contractor and Subcontractor. Subcontractor represents that in entering into this Subcontract, it did not rely on any previous oral or written representations, inducement or understandings of any kind or nature." *Id*. In addition, the subcontract could "not be modified or altered except for writing, signed by Contractor and Subcontractor." *Id*. (Sec. 18(c)).

## D. PERFORMANCE

Performance disputes arose at some point after Lockett began work. Lockett claims that Champion failed to make timely progress payments and caused delays. Dkt. 26 at 4. Mr. Hanson claims that he inquired of Champion as to whether the subcontract contained a "timing mechanism for payment" and whether it contained "any terms regarding notice and claims," but that Champion's home office would not provide him with a copy of the contract. *Id*.

Lockett maintains that during the project, it communicated repeatedly with Champion regarding delay damages and cost overruns that Lockett was incurring as a

---

[7] Notably, Exhibit C to the subcontract is not part of the record filed with the Court. Mr. Hanson maintains that Exhibit C "could have only been" the recovery schedule provided by Champion during the June 2005 negotiations, *see* Dkt. 26-2, because the recovery schedule "was the only schedule presented when Lockett reached its agreement with Champion." Dkt. 26 at 7. Apparently, Lockett agrees that the subcontract and the corresponding documents filed with the Court, *see* Dkt. 23-4, represent the documents Mr. Hanson signed on behalf of Lockett. Dkt. 29-2 at 3 (Deposition of Mr. Hanson). Lockett appears to allege that Champion did not produce Exhibit C in discovery.

ORDER – 8

result of delays. *Id.* at 5. Mr. Hanson maintains that at one point, he asked Mr. Leedom about possible compensation "under a material escalation theory." According to Mr. Hanson, Mr. Leedom communicated that Champion would obtain such funds and would use them to partially reimburse Lockett for delays. *Id.* Mr. Hanson also stated that Champion "had always told [Lockett] and recognized that they owed [Lockett] money, and [Champion's] remedy . . . was that they were getting paid escalation monies from Lincoln and [Champion was] going to take and pay [Lockett] out of that pool of money." Dkt. 29-2 at 8 (Deposition of Mr. Hanson).

Lockett also contends that at various times during the project Champion refused to issue payment even for undisputed amounts owed to Lockett. Dkt. 25 at 13.

On November 28, 2005, Lockett wrote Champion a letter outlining some "outstanding issues" including (1) Champion's failure to return the subcontract to Lockett, (2) Champion's failure to pay for Lockett's "change orders," and claimed that (3) Champion's extension of the agreed work schedule caused Lockett's "General Conditions" to begin to eat up its profits. Dkt. 26-4 (Exhibit 3). The letter also advised that lumber-related materials had risen in cost, but Lockett was unsure of how to proceed because it did not have a copy of the signed subcontract which Lockett maintained contained "escalation language." *Id.* Lockett also included a table of costs and requested payment for monies owed. *Id.* at 3. Apparently, Lockett acknowledged this letter as a delay claim and sent it to in-house personnel in Michigan. Dkt. 25 at 11.

Champion maintains that, per Lockett's bid, Champion was to pay Lockett a flat fee for each unit it constructed. Dkt. 22 at 7 (*citing* Dkt. 23-4 at 18) (Lockett's "Billing Schedule of Values"). Champion contends that this price already included material, labor, supervision, overhead and profit. In an undated letter, Champion advised Lockett that it would not reimburse Lockett for the requested "General Condition monies." Dkt. 26-4 at 5.

Lockett's work for Champion on the Fort Lewis housing project was completed in June or July 2006. Upon completion of the project, Champion allegedly withheld payment of over $700,000 of progress payments. Lockett maintains that "because it

ORDER – 9

would have . . . [been] put out of business if it did not receive those withheld funds, Lockett agreed to release its lien rights security interest," and signed an interim agreement. Dkt. 26-3 at 5; Dkt. 26-5 (Exhibit 5). According to the interim agreement, signed by the parties on June 23, 2006, the parties disputed the scope and form of lien waiver releases that Lockett was required to sign before it could receive payment for work that had been completed. Dkt. 26-5 at 2. The parties reached agreement whereby Champion agreed to pay Lockett $730,878 in exchange for receipt of lien waivers. *Id*. Champion also agreed to pay $2,442.46 in settlement for disputed time and materials charges. *Id*. However, Lockett reserved its right to claim impact and delay damages. *Id*. at 4.

### E.   THE INSTANT ACTION

On January 30, 2008, Lockett filed a complaint against Champion in Pierce County Superior Court, alleging breach of contract and unjust enrichment. Dkt. 1-2, 11-15. On February 19, 2008, this action was removed to this Court. Dkt. 1. Lockett alleges that Champion is in breach because it failed to make full and proper payment. Lockett maintains that its work was affected by Champion's delays, and as a result, Lockett incurred substantial costs and loss of profits.

On March 11, 2009, Champion filed a motion for summary judgment. Dkt. 22. First, Champion argues that Lockett's claims fail because the parties entered into an integrated contract which did not include an end date, and extrinsic evidence cannot be offered to contradict terms of the contract. In addition, Champion contends that it had discretion to award Lockett buildings, and that no consideration supports a separate claim that the contract contained an end date for Lockett's work. Second, Champion maintains that Lockett had no reasonable expectation that the project would be completed by November 2005 because Champion had only been awarded 40 buildings, and not 67 buildings, at the time the parties reached the June 2005 agreement. Third, Champion contends that Lockett has offered no evidence that supports its argument that Champion caused unreasonable delay. Finally, Champion contends that Lockett failed to provide Champion notice of its claims as set out in the parties' subcontract.

On March 30, 2009, Lockett filed a response. Dkt. 25. First, Lockett maintains that the subcontract was not fully integrated because it did not contain Exhibit C and because Champion never finalized the subcontract or sent it back to Lockett. Second, Lockett contends that it incurred additional costs as a result of unreasonable delays caused by Champion. Third, Lockett maintains that Champion waived, by conduct, its rights under the subcontract requiring Lockett to provide notice of its claims.

On April 3, 2009, Champion filed a reply. Dkt. 28. On April 28, 2009, the Court granted Lockett leave to file the declaration of James Cicchini. Dkt. 34. On May 6, 2009, Champion filed a response to Lockett's filing of this declaration. Dkt. 40.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.     BREACH OF CONTRACT**

Under the rule of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), "federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law." *Gasperini v. Center for Humanities, Inc*., 518 U.S. 415, 427 (1996).

In this case, the Court concludes that there are outstanding issues of fact that preclude summary judgment. First, there are material facts at issue concerning the issue of whether, and if so, at what time the parties assented to the Champion-Lockett subcontract. Second, there exists a genuine dispute as to whether the subcontract is integrated. Third, even if the Court were to conclude that the subcontract is integrated, there exists factual issues concerning whether the subcontract contains any ambiguities. Finally, assuming the subcontract was valid, there exists outstanding factual issues concerning the issue of Lockett's notice of its claims, as well as Lockett's claims that Champion waived the notice requirements under the subcontract.

Before reaching issues concerning the agreements reached by the parties, the Court first addresses the issue of whether Lockett has shown that there are disputed issues of fact regarding its delay damages claim.

**1.     Delay Damages**

Assuming that the subcontract was enforceable, the parties agree that the subcontract provision releasing Champion for liability (Section 3(f) of the subcontract, *see supra* at 8) due to delay is not enforceable in Washington. *See* RCW 4.24.360.

ORDER – 12

In every construction contract, there is an implied term that a contractor will not hinder or delay the contract. *See V.C. Edwards Contracting Co. v. Port of Tacoma*, 83 Wn.2d 7, 13 (1973). If a subcontractor can prove a delay damages claim, it is "entitled to the reasonable costs of performing work as changed by the unanticipated circumstances." *Id.* at 15.

The four corners of the subcontract, as filed with the Court, does not contain a completion date. As will be discussed in subsequent sections, Lockett has met its burden in showing that the subcontract is not unambiguous as to what the parties intended regarding time of completion. In any event, Lockett appears to argue that the delays caused by Champion were unreasonable; Lockett does not appear to argue that the parties agreed by oral or written agreement that Lockett would be automatically entitled damages in the event construction went beyond November 16, 2005.

Champion maintains that Lockett's delay damages claim fails as a matter of law because it has not presented any evidence that supports its argument that Champion caused delay. Specifically, Champion contends that Lockett relies solely on an inadmissible expert report containing conclusory statements that Champion caused delay.

The Court agrees that Lockett's expert report should be stricken because Lockett did not attach a sworn affidavit, and because it is not clear that the report is based on personal knowledge. Fed. R. Civ. P. 56(e)(1). The Court also notes that other evidence provided by Lockett, including Mr. Hanson's declaration, could have been more specific regarding Lockett's allegations that Champion caused delays on the project. However, Lockett has nonetheless shown a triable issue of fact regarding its delay claim. First, Mr. Hanson stated that Champion acknowledged that it was causing delays and even promised to reimburse Lockett for delays under a "material escalation theory." Dkt. 26 at 5. Second, Lockett maintains that construction was to proceed according to a schedule provided by Champion. According to this schedule, Lockett was to perform various work on buildings, to include sheathing and siding. *See* Dkt. 26-2 (Exhibit 1). A trier of fact may infer from this schedule that the initiation of Lockett's work projects were dependent on Champion first facilitating at least partial completion of preliminary work on the

ORDER – 13

buildings. In other words, it is apparent that Lockett's delay claims are based on its allegations that work could not proceed on buildings according to the schedule because Champion had fallen behind schedule in completing necessary preliminary work.

Another issue for trial will be whether any delay caused by Champion was reasonably unanticipated by Lockett.

### 2. Contract Formation

As will be further discussed, the parol evidence rule in Washington generally excludes the admission of extrinsic evidence that contradicts or varies the terms of an integrated contract. *Berg v. Hudesman*, 115 Wn.2d 657, 670 (1990). However, extrinsic evidence may be admitted to determine the issue of the validity of a contract or to impeach its creation. *Matter of Prior Bros., Inc.*, 29 Wn. App. 905, 909 (1981) (*citing Bond v. Wiegardt*, 36 Wn.2d 41, 48 (1950)).

Mutual assent is required for the formation of a valid contract. *Yakima County (West Valley) Fire Protection Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 388 (1993). Mutual assent requires offer and acceptance, and requires that the parties "manifest to each other their mutual assent to the same bargain at the same time." *Id.* (citation omitted). The mutual assent of the parties must be gleaned from their outward manifestations. *Mutlicare Ctr. v. State, Dep't of Soc. and Health Servs.*, 114 Wn.2d 572, 587 (1990). Generally, acceptance of an offer or counteroffer must be communicated to the offeror unless waived by the terms of the offer. *See* Restatement (Second) of Contracts, § 53 (1981).

In addition, the Washington Supreme Court has stated:

> "The acceptance of an offer is always required to be identical with the offer, or there is no meeting of the minds and no contract." *Blue Mt. Constr. Co. v. Grant Cy. Sch. Dist.* 150-204, 49 Wash.2d 685, 688, 306 P.2d 209 (1957); *accord Rorvig v. Douglas*, 123 Wash.2d 854, 858, 873 P.2d 492 (1994). Generally, a purported acceptance which changes the terms of the offer in any material respect operates only as a counteroffer, and does not consummate the contract. *Roslyn v. Paul E. Hughes Constr. Co.*, 19 Wash.App. 59, 63, 573 P.2d 385 (1978). However, an acceptance can also request a modification of terms, so long as the additional terms are not conditions of acceptance and the acceptance is unequivocal. *Rorvig*, 123 Wash.2d at 858, 873 P.2d 492. If any additional conditions contained in the purported acceptance can be implied in the original offer, then they also do not constitute material variances so as to make the acceptance ineffective. *Roslyn*, 19 Wash.App. at 64, 573 P.2d 385. What constitutes a material

ORDER – 14

> variation is dependent upon the particular facts of each case. *Northwest Television Club, Inc. v. Gross Seattle, Inc.*, 96 Wash.2d 973, 980-81, 640 P.2d 710 (1981).

*Sea-Van Investments Associates v. Hamilton,* 125 Wn.2d 120, 126 (1994).

Normally, the existence of mutual assent or a meeting of the minds is a question of fact. *Id.* (*citing Multicare Med. Ctr.*, 114 Wn.2d at 586 n. 24.

In this case, Lockett maintains that it began work after reaching an oral agreement with Champion. In June 2005 Champion produced a written contract form containing a merger clause. By providing this contract to Lockett, Champion appears to have made an offer to Lockett to integrate any prior oral agreement into a fully integrated written contract. Lockett made some written notations on this contract, and added documents to the contract, including Addendum A, which included a schedule of values. In so doing, it appears that Lockett was making a counteroffer when it returned the signed contract to Champion. Champion then signed the subcontract.

Ordinarily, the signing of a contract constitutes acceptance. *See Yakima County*, 122 Wn.2d at 389. However, Lockett maintains that Champion never returned the signed contract to Lockett, and that Champion advised Lockett that Champion's home office in Michigan would have to approve Lockett's revisions prior to acceptance. As late as November 28, 2005, after the November 16 date Lockett claims the parties orally agreed would constitute the completion date, Lockett wrote Champion informing it that Lockett had not received a copy of the signed subcontract.

In addition, Mr. Leedom, of Champion, did not know whether, or when, Champion returned the contract to Lockett. Of course, returning the physical contract may not have been a required method of acceptance, and it is possible that Champion adequately informed Lockett that it accepted Lockett's counteroffer at an earlier point in time after June 22, 2005. However, Lockett has met its burden in showing that a triable issue of fact exists as to mutual assent. In sum, there is a genuine dispute between the parties as to whether the parties mutually assented to the subcontract, and if so, at what time. Also at issue is whether the parties made an oral agreement that governed all or part of the project.

ORDER – 15

### 3. Contract Integration and Parol Evidence

In addition to the contract formation issues, there are outstanding factual disputes regarding the issues of contract integration and ambiguity.

At the summary judgment stage, a court may be asked to determine as a matter of law the construction of terms of a contract. Construction is a question of law and requires the court to determine the legal consequences that flow from a contract's terms. *Berg*, 115 Wn.2d at 663. Contract interpretation, on the other hand, requires the court to ascertain the meaning of contract terms. *Id*. If there is disputed evidence concerning the parties' intent, the rules of contract interpretation apply and a trier of fact must determine the meaning of the contract, often based on extrinsic evidence. *See* 25 WAPRAC § 5.2. Once the facts of a case have been established, determining the legal effect of disputed contract terms becomes a question of law, and the court then applies settled rules of construction. *See id*.

In interpreting contracts, Washington courts apply the parol evidence rule, which excludes extrinsic evidence which adds to, subtracts from, varies, or contradicts written instruments which are "contractual in nature and which are valid, complete, unambiguous, and not affected by accident, fraud, or mistake." *Berg*, 115 Wn.2d at 670 (citation omitted). The parol evidence rule applies only to integrated contracts, which are contracts that are intended to be a final expression of the parties' agreement. *Id*. When a contract is only partially integrated, the parol evidence rule applies to those terms which constitute a final expression of the parties' agreement, but the rule does not apply to the terms not included in the writing. *Id*. The open terms may be proved by extrinsic evidence provided that the additional terms are not inconsistent with the written terms. *Id*. Whether a contract is integrated or only partially integrated is a question of fact. *See id*. at 662. An ambiguity in a contract also creates issues of fact. *See id*.

#### a. Contract Integration

The Champion-Lockett subcontract contains an integration clause. Dkt. 23-4 (Exhibit 2) (Sec. 18(b)). Although an integration clause presents a "strong indication" that the parties intended complete integration of a written agreement, *Lopez v. Reynoso*, 129

ORDER – 16

Wn. App. 165 (2005) (citation omitted), the mere inclusion of such a clause is not conclusive. *Black v. Evergreen Land Developers, Inc.*, 75 Wn.2d 240, 251 (1969). A court is not required to adhere to such a clause if it appears the clause is factually false. *Id*.

Lockett maintains that the subcontract filed with the Court is not fully integrated. Specifically, Lockett contends that the contract is not complete because Exhibit C is missing. The Court finds Lockett's argument to be persuasive. According to the subcontract, Lockett was required to complete its work "according to the schedule attached hereto as Exhibit C." Dkt. 23-4 (Sec. 3(a)). A trier of fact could find that because of this missing exhibit, the subcontract as filed was not fully integrated.[8]

### b. Ambiguity

Lockett has also met its burden in showing that the subcontract may be ambiguous with regard to time of performance. Champion argues that the subcontract is not ambiguous because it does not include a completion date, and because it provides Champion with discretion to award buildings to Lockett. Champion maintains that at the time the contract was signed, Champion had only been awarded 40 buildings from Lincoln, and thus Lockett is incorrect in its contention that Lockett was to work on buildings numbered through 67. In support of this argument, Champion points to the heading of the first page of the subcontract, which describes the project as "Subphases 1-8, Buildings ___ - 40." Champion also argues that Lockett's claim that the contract called for a completion date is undermined by Lockett's own admission that the work schedule changed during the course of construction. Dkt. 40 at 2.

---

[8]Champion also maintains that Mr. Hanson's deposition testimony contradicts his declaration because he admitted during the deposition that the signed contract did not contain a schedule. Dkt. 28, 3-4 (Defendant's reply). The Court does not find Mr. Hanson's statements to be contradictory. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (trial court may not strike declaration unless it "flatly contradicts" prior testimony). Mr. Hanson stated only that the subcontract did not "appear" to have language about a specific completion date. *Id*. (citing deposition testimony). He went on to say that everything he had seen and been told indicated a November 2005 completion date. *Id*. In any event, there are outstanding issues of fact regarding the missing Exhibit C.

ORDER – 17

Champion is correct in stating that the subcontract provides that each sub-phase will be separately administered, and that Champion is not obligated to deal exclusively or enter into any agreements with Lockett. Champion also correctly asserts that the subcontract, as filed with the Court, does not contain a specific completion date. The Court is not persuaded, however, that Champion has shown that the contract does not contemplate a completion date. To the contrary, the subcontract states that each sub-phase shall have a separate "time of performance" and "performance schedule." Furthermore, the subcontract contains a time of performance section, which states that "time is of the essence" and required Lockett to begin work immediately, and that Lockett was bound to a schedule that is missing from the record. In addition, Champion's claim that the subcontract could only have included up to Building No. 40 is contradicted by Lockett's addendum, which includes a schedule of values numbered through Building No. 67. It appears that the parties intended the subcontract to serve as the written agreement governing sub-phases 1 through 8, but it is not clear which buildings the parties agreed were included in these sub-phases. Finally, the parties have not directed the Court to the change orders that may or may not affect Lockett's delay damages claim. Lockett also maintains that it was never issued any amendments by Champion[9]. Dkt. 25 at 4.

As a result of this ambiguity, the legal effect of the time of performance provisions cannot be determined as a matter of law, and extrinsic evidence may be admissible for consideration by a trier of fact.

**4.    Waiver**

As discussed above, issues of fact preclude summary judgment regarding contract formation. But even assuming the subcontract was enforceable before Lockett was first

---

[9]Champion points out that Mr. Hanson testified that Lockett frequently received new work schedules. Dkt. 23-5 at 6 (Deposition of Scott Hanson). However, Mr. Hanson was unequivocal about whether the change orders initially changed the end date. In addition, the Court notes that according to the subcontract, a change order modifying the work schedule would have to be signed by both parties. Dkt. 23-4 (Section 3(b)). It is not clear that this occurred. Also unclear is what effect a change order would have on Lockett's claim for delay damages.

ORDER – 18

notified of delays, there are outstanding issues of fact regarding Lockett's claims that Champion waived the notice requirements of the contract.

Champion maintains that Lockett's delay claim fails because it failed to comply with the procedures for making a delay claim set forth in the subcontract. Champion contends that Lockett failed to make such a claim within five days of a change of schedule which would have caused a delay to Lockett. Dkt. 28, 8-9. In addition, Champion maintains that it did not waive this contract provision because Champion expressly rejected Lockett's request for additional "general condition" monies.

Washington law generally requires subcontractors to follow contractual notice requirements unless those procedures are waived. *Mike M. Johnson v. County of Spokane*, 150 Wn.2d 375, 386 (2003). A waiver may be implied by conduct; however such a waiver "requires unequivocal acts of conduct evidencing an intent to waive." *Id*. (citation omitted).

Here again, Lockett has met its burden in showing genuine issues of fact are outstanding. First, Lockett maintains that Champion promised it reimbursement of escalation costs, but never provided this reimbursement. Whether Champion made such a promise, and whether such conduct constitutes a waiver is a question of fact. Second, it is not clear from the record at what times Lockett became aware of delays giving rise to its claims for delay damages. Thus, the Court cannot determine whether or not Lockett complied with contractual notice requirements.

Finally, the Court concludes that there are outstanding issues of fact precluding summary judgment concerning the lien release agreements signed by the parties. Both parties agree that at least the final agreement contains a clause whereby Lockett claims it has reserved delay damages. Issues concerning prior release agreements, as well as Lockett's claims of duress, can be resolved at trial.

### III. ORDER

Therefore, it is hereby **ORDERED** that

Defendant's motion for summary judgment (Dkt. 22) is **DENIED.**

DATED this 13th day of May, 2009.

_____
BENJAMIN H. SETTLE
United States District Judge

ORDER – 20